## THE ISTHMIAN.

(District Court, D. Oregon. December 27, 1912.)

No. 5,600.

1. SHIPPING (§ 84*)—LIABILITY OF VESSEL—INJURY TO STEVEDORE—INSUFFICIENT LIGHT WITH WHICH TO WORK.

Libelant, a longshoreman engaged in unloading a ship, with others, was assisting to place the cover on a hatch at 10 o'clock at night, under direction of a mate. The night cover used was composed of planks fastened together in pairs, and when they had been raised by the winch, and lowered until they rested across the hatch coamings, libelant was directed to climb upon them and unloose the sling from the fall. When he did so, they fell apart and into the hold, carrying him with them, and resulting in his injury. Held, on the evidence, that the light furnished for the men to work by was insufficient to enable them to see that the planks rested securely on the coamings, which was the proximate cause of the injury, and rendered the ship liable therefor; also held, that libelant was not chargeable with contributory negligence.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 342, 349–351; Dec. Dig. § 84.*]

2. DAMAGES (§ 131*)—INJURY TO PERSON—AMOUNT OF AWARD.

A stevedore, who was severely and painfully, but not permanently, injured by falling into the hold of a ship through the negligence of the officers, and was laid up for four months, awarded $1,000 damages, besides expenses of his cure and pay for loss of time.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 357–367, 370; Dec. Dig. § 131.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty: Suit by George Wolf against the steamship Isthmian; the American-Hawaiian Steamship Company, claimant. Decree for libelant.

Giltner & Sewall, of Portland, Or., for libelant.

Teal, Minor & Winfree, of Portland, Or., for claimant.

WOLVERTON, District Judge. George Wolf brings libel to recover for personal injuries sustained by reason of falling from the hatch on the main deck of the steamship Isthmian to and upon the shaft alley below, a distance of about 27 feet, which injuries are alleged to have been caused through the negligence of the ship. The American-Hawaiian Steamship Company is the owner and claimant of the Isthmian, and files an answer to the libel.

The accident happened at No. 4 hatch covering, No. 3 hold, on June 6, 1912. The alleged causes of the accident are: First, that the officers and agents of the steamship directed the night covering to be put on the hatch, instead of the regular covering commonly used when the ship is at sea; second, that in putting on the night covering the officers were negligent in not providing the libelant a safe place upon which to work; and, third, that they failed to provide sufficient light by which the work could be safely done. The claimant denies negligence, and alleges contributory negligence on the part of the libelant.

[1] The night covering, by which the hatch was protected in port when the ship was not engaged in loading or unloading, consisted of eight sets of planks, constructed with two in each set, held together by cleats, one cleat at each end of the planks and two in the center. A space of perhaps 2 inches was left between the two planks. These planks were 2 inches in thickness, a foot wide, and 15 feet 4 inches long; the hatch being 14 feet wide. These hatch coverings were raised from between-decks in the morning, when the work of unloading the vessel began, and were placed at the side of the hatch, and left there for use when wanted. The planks were put in one pile, one on top of the other, and hoisted by means of a winch and hoisting apparatus. The sling was wrapped twice around the planks thus piled, and then hooked onto the fall, and they were raised in that manner. When placed at the side of the hatch, the sling was left on the hatch coverings. About 10 o'clock on the night of the accident the longshoremen who were engaged in unloading the boat were directed to put the hatch coverings on. In doing this the coverings were raised by the winch under the order of some person, either the third mate of the vessel or the hatch tender. They were then lowered onto the hatch coaming, but, not being satisfactory, were ordered to be raised again, which was done. They were again lowered, so that they rested upon the coaming athwart the hatch. At this time the libelant was directed to climb upon the boards and unloose the sling from the hook attached to the fall. In doing this, through some cause which is hardly explainable, the planks fell apart and into the hold of the ship, precipitating the libelant also into the hold. He fell upon his face, resulting

in his nose being broken and his face cut about the forehead, the nose, and the upper lip. He also suffered a fracture of the right wrist, a fracture of three of his toes; a dislocation of another, a fracture of one of his ribs, and was otherwise bruised by one set of planks falling upon him.

It appears that it was common for ships to use night coverings for the hatches when engaged in loading and unloading, and this covering was perhaps as well constructed and suitable for the purpose for which it was designed as any that has been in use in the port. The ship was therefore not negligent in directing this covering to be used instead of the regular covering. There is a dispute in the testimony as to who gave the orders for hoisting these hatch coverings in place and directing how they should be placed athwart the hatch before the libelant was ordered to go upon them for unloosing the sling. The longshoremen who were working about the hatch at the time all testify that the order was given by Bennett, the third mate of the ship, and that the work of putting on the night covering of the hatch was carried on under his supervision and direction. This has some corroboration in the testimony of Hardwick, a witness for the claimant, who was the quartermaster of the ship. He says in effect that Bennett had charge of the hold wherein the libelant fell, and that his duties there were to see that the cargo was taken out in good order and that the hatches were properly covered for the night. Upon the other hand, the claimant urges that it was not the duty of the ship to supervise the putting on of this covering, but that it was a matter of detail in the work of the longshoremen, and that, when ordered so to do, it was their duty to put on such covering, and at their own risk. There is some testimony to the effect that Oberg, who was the hatch tender, directed the placing of the hatch covering on this occasion, and that it was his duty to oversee the same.

After a very careful consideration of the testimony, I am strongly impressed with the view that it was the duty of the ship, through its proper officers, to direct and superintend the putting on of this night hatch covering when it became necessary, and that in fact Bennett, the third mate, was present at the time and did direct the manner in which the covering should be placed on the hatch. It being his duty to do this work, he was also charged with the duty of observing ordinary care and precaution in directing how the work should be done for the protection of the men employed in doing it. From the testimony, I cannot say, however, that the officer was negligent. It does not satisfactorily appear how the planks were placed across the hatch and by what reason they fell after the sling was unhooked and loosened from them.

As to the third alleged cause of negligence, namely, that the boat failed to sufficiently light the deck and the hatchway to enable the men to do their work safely, there is testimony both ways. All the longshoremen, seven in number, testify that the light on the deck was very dim; some of them going so far as to say that there was no light there at all. There was, in fact, however, an arc light located on the

mast some 20 or 25 feet aft of the hatch, and perhaps 25 feet in height. This light is described as being some 40 feet distant from the place of the accident. The longshoremen say, further, that the light was so dim that the workmen about the hatch could not be distinguished across the hatch; that an outline of their forms could be seen, but the individuals themselves could not be recognized. George Wolf, the libelant, testifies that, when he climbed upon the boards, he had to feel for the sling, and that he was unable to see it before getting upon the planks. The witnesses for the libelant all concur in the statement that the light was entirely insufficient to enable the workmen to proceed with their work without peril to themselves.

The officers of the ship dispute this testimony, and in general say that the light was bright, and entirely sufficient for the purpose. The captain of the ship, who was then the second officer, says that it was light enough to enable a person to read a newspaper without trouble. Bennett, who was third mate, and was within, according to his own testimony, 10 feet of the hatch at the time of the accident, says: "In my judgment it [the lamp] would give sufficient light." And then, when asked whether it was light enough on the deck near the hatch or not, he answered: "Well, I think it was light enough." Hardwick, the quartermaster, and also the captain, testify that there were two lights on the ship, one on the mainmast and one on the foremast. Hardwick says the light was in good condition, and was good to work under. He did not see the light, however, before the accident happened, but did see it a short time afterwards. He had some conversation with Bennett about the light, and he says that Bennett asked him if he (the witness) thought the lights were bright enough. This would seem to indicate that there was some doubt in Bennett's mind as to the sufficiency of the lights. John Garrigan, who was the engineer of the ship, testifies that the lights were bright and in good condition; but he did not see them at the time, nor until after the accident. And so of Captain McNeill, who was in bed when the accident happened, and knew nothing of it, but saw the lights some time afterwards. Mr. Dosch, who was clerk on the dock, and Mr. Schaublin, who was superintending the men in raising the cargo, both testify that the light was sufficient. Schaublin was on the boat at the time the accident happened, and it was he who gave orders to cover the hatches.

In this conflict of testimony, it is somewhat difficult to arrive at a solution of the question whether the light was sufficient or not. I am of the opinion, however, that the greater credit should be accorded the longshoremen. They were immediately at the place of the accident, engaged in doing the work, and their attention would more likely be called to the condition of the light at the immediate time than that of the witnesses upon the part of the ship, except Schaublin and Bennett, who were also directly present. Bennett, however, seems to be in doubt as to the sufficiency of the light, while Schaublin thought it was ample. I conclude, therefore, that the light on the mast, placed there for the purpose of lighting the hatch, was insufficient to give proper light for the workmen while engaged in putting on the night hatch. It is altogether probable that this was the proximate cause of

the accident. Undoubtedly the boards, being piled in one pile, one on top of the other, were not safely placed across the hatch, because when the sling was loosened they fell apart of their own accord, and precipitated the libelant into the hold of the ship, all of the boards going down with him. This would scarcely have happened if the boards had gained lodgment at both ends upon the coaming of the hatch; it being remembered that they were 15 feet 4 inches long, while the hatch was but 14 feet wide. If it had been lighter, it is altogether likely that either the person directing the manner of doing the work or some of the men themselves would have been able to see or discover the unsafe condition of the landing of the boards on the hatch. Therefore I think that the ship is liable on account of negligence in failing to provide proper lights for the work to be carried on in covering this hatch with the night covering.

[2] This leaves to be determined the amount of damages which the libelant sustained. Besides the injuries received, as heretofore stated, it is claimed that the libelant has suffered a curvature of the spine laterally. This curvature, however, was not discovered until shortly previous to the time of this trial, and the libelant has never at any time complained to any of his physicians of any injury to the back, although two of them examined him prior to this time. Two physicians who were called for the claimant testified that a slight lateral curvature in the spine is not unusual in healthy persons, which is accounted for by natural causes. The libelant has suffered some shock to his nervous system. From the testimony of the physicians for claimant, it would seem that none of these injuries are of a permanent nature; one of the physicians stating that the recovery was sufficiently complete, or should be at the end of three months, and the other at the end of four months, to allow the libelant to engage in his usual vocation with but slight inconvenience. There is some inconvenience, however, to the libelant in his breathing, caused by the crushing of the bridge of the nose, though this will probably not impair his health, and his face is left disfigured. Upon the whole, I am of the opinion that the libelant should be allowed $1,000 for his personal injuries. To this should be added the loss of his labor for four months, at $80 per month, $320, his reasonable expenses for physicians' services, $150, and $51 at the hospital, aggregating $1,521.

The claimant insists that, if the ship was negligent at all, the libelant was also negligent, and that the damages should be reduced on that account. I do not agree with the contention that the libelant was also negligent. He was directed to climb upon the boards; and it should be said, further, that the hatch coaming was about 3 feet in height, and the boards, when piled up, were about 32 inches, making nearly 6 feet in height from the deck of the ship for the libelant to climb upon. Libelant says he was not afraid to get upon the boards, but that he protested because it was dark. He was told, notwithstanding, to go on up and unloose the sling. He perhaps might have observed the unsafe condition of the planks, if there had been light enough for him to see them well and determine their adjustment for

himself. But the very fault we are speaking about is the one that contributed to the accident, namely, the lack of sufficient light.

The decree will be for the libelant in the sum of $1,521, together with the costs of suit.